381 F.2d 100
 Henry HALLADAY, as Acting Trustee Under the Will of Gertrude H. Goodridge, by Appointment of the District Court of the Fourth Judicial District of the State of Minnesota, in and for Hennepin County, Appellant,
v.
J. J. VERSCHOOR, Appellee.
 No. 18491.
 United States Court of Appeals Eighth Circuit.
 August 16, 1967.
 
 COPYRIGHT MATERIAL OMITTED Henry Halladay, Minneapolis, Minn., for appellant; Dorsey, Owen, Marquart, Windhorst & West, Minneapolis, Minn., and M. T. Woods, Sioux Falls, S. D., on brief.
 Ellsworth E. Evans, Sioux Falls, S. D., T. R. Johnson, of Danforth, Danforth & Johnson, Sioux Falls, S. D., for appellee.
 Before VAN OOSTERHOUT, MATTHES and MEHAFFY, Circuit Judges.
 MEHAFFY, Circuit Judge.
 
 
 1
 This action by Halladay, plaintiff-appellant and court-appointed Trustee under the Will of Gertrude H. Goodridge, against J. J. Verschoor, defendant-appellee, seeks damages for the trust estate allegedly resulting from wrongful participation in a series of transactions by Verschoor with one L. E. Melrin, the original Executor-Trustee under the will. Melrin, a Minnesota attorney, was authorized under the will to make distribution of certain assets of the estate to tax-exempt charitable organizations of his own selection. Melrin resigned as Trustee on December 27, 1960 because of his defalcations from the estate aggregating a cash shortage of approximately $350,000.00. Melrin was indicted, tried and convicted of filing felonious, false and fraudulent reports as such Trustee, and sentenced to an indeterminate term in the state penitentiary.
 
 
 2
 The original complaint in this suit was filed May 4, 1964, and it, as did a first amendment thereto, sought an accounting. The District Court indicated doubt that the complaint and amendment made such clear and specific averments of a complicated account as would justify this type of equity action. A second amended complaint was permitted stating a cause of action at law. The second amended complaint alleged Verschoor's participation and engagement in a conspiracy with Melrin, designating certain asserted wrongful acts, as violative of Melrin's trust and by which Verschoor unjustly enriched himself "at the expense and to the disadvantage of plaintiff's trust estate," at least in the sum of $134,884.00. The court treated Verschoor's motion to strike the second amended complaint as a motion for summary judgment and denied it. Verschoor's answer to the second amended complaint alleged failure to state a cause of action, a general denial of wrongdoing or conspiracy, and set up affirmative defenses including the six-year statute of limitation and laches in the commencement of the action and defect in the complaint by reason of failure to prosecute by the real party in interest.
 
 
 3
 The trial to a jury commenced on May 2, 1966, resulting in a finding for plaintiff on May 11, 1966 in the amount of $2,167.18. The trial court set aside the jury verdict by entry of judgment n.o.v. based upon "all of the reasons and upon all of the grounds set forth in defendant's motion for a directed verdict." We reverse and remand for a new trial for reasons as will appear.
 
 
 4
 ALLEGED FRAUDULENT TRANSACTIONS.
 
 
 5
 The transactions between Verschoor and Melrin, in the main, revolve around Verschoor's acquisition of Central Lumber Company stock, assets of the trust estate, and a note of the Minnesota Screw Company, a concern in which Melrin was financially interested. The charitable institutions involved were St. Joseph's Hospital, Home and Academy at Mitchell, South Dakota, the Presentation Mothers Home at Aberdeen, South Dakota, the Volunteers of America and the Aberdeen Assembly of God Tabernacle at Aberdeen, South Dakota.
 
 
 6
 From the record, it appears that Verschoor first became acquainted with Melrin when he attempted to buy ten shares of Central Lumber Company stock from the estate for a price of $160.00 per share through one Vander Aarde. Verschoor issued his check for $1600.00, payable to Melrin, Executor, under date of October 1, 1956. The check was not cashed and a few months later Verschoor went from his home in Mitchell, South Dakota to Minneapolis, accompanied by his attorney, and talked to Melrin, learning from Melrin of his power under the Goodridge will to make gifts to tax-exempt charities. Melrin then dispatched through Vander Aarde a letter dated April 30, 1957 returning Verschoor's check for $1600.00 and stating that he could not sell this stock for a price of less than $250.00 a share due to a court order. It is maintained, however, that through the actions of Melrin, assisted by Verschoor, substantial shares of this stock were transferred to charitable institutions as benevolent gifts and then "bought" from said institutions for a substantially lower amount than the $250.00 price fixed by the court, thus effectuating a loss to the trust estate and an enrichment to Verschoor.
 
 
 7
 We refer to two of the transactions which occurred as illuminating the connection between Verschoor and Melrin and as indicative of the alleged conduct constituting the basis for this litigation.
 
 
 8
 On July 31, 1958, Verschoor called Sister M. Steven, who was then Acting Supervisor and Administrator of the St. Joseph's Hospital, Home and Academy at Mitchell. Sister Steven was preparing to leave that day at noon for a retreat and advised Verschoor of her plans, but said that she could see him that morning prior to her departure from the city. Verschoor met with Sister Steven and advised her that he had been visiting with friends in the Twin Cities and that one of them, whom he was not at liberty to name, was trustee of an estate and had available funds that could be used for educational and nonprofit purposes, and inquired of her whether her organization could use funds in the event he could obtain them. She naturally replied affirmatively and, also, since he mentioned educational institutions, discussed with him the Presentation Sisters College at Aberdeen. Following this conversation, Sister Steven left for the retreat at Aberdeen, South Dakota, and upon her return to Mitchell learned that Verschoor had been calling her. She again met with him and Verschoor advised that he had been successful in securing two hundred shares of Central Lumber Company stock, and would like to give one hundred shares to St. Joseph's Hospital and one hundred shares to the Holy Family Church in Mitchell. He suggested the necessity of a resolution which he dictated to her and which, inter alia, constituted a receipt for the stock. The resolution was recorded in the minutes and authorized the sale of one hundred shares of stock to Verschoor for $10,000.00 and provided that the other one hundred shares be given to the Holy Family Church. Sister Steven accepted Verschoor's check for $10,000.00, but never saw any stock certificates. Nonetheless, she signed a receipt for two hundred shares which receipt was later filed by Melrin in his accounting of the Goodridge estate matters with the Minnesota District Court. In December, 1959, Verschoor obtained from Sister Steven's successor a new resolution authorizing transfer of the two hundred shares to himself.
 
 
 9
 Verschoor pestered Melrin for more stock and shortly after Christmas in 1958 received a letter from Melrin enclosing a check for $76,000.00, payable to the Presentation Mothers Home signed by Melrin, Trustee. (There were not sufficient funds in this account to cover the check.) On December 28, 1958, Verschoor went to Aberdeen, called on the Mother Superior of the Presentation Home and obtained her endorsement on the $76,000.00, check, as well as a receipt for the $76,000.00. At that time he gave her fifteen crisp, new one hundred dollar bills. Verschoor explained to Mother Carmelita of the Presentation Home about the Central Lumber Company stock being in the Goodridge estate and advised that the estate had not been liquidated and it would be embarrassing to ask for payment of the $76,000.00 at that time. He said that if he were permitted to return the check to the estate it could use the funds to help liquidate the Lumber Company and he was sure interest would be paid on the money in the interim. He also said that the $1500.00 was in partial payment of the $76,000.00. Later, in June of 1959, he returned to the Convent with a check for $1,000.00 which he said was interest on the money. Verschoor took the $76,000.00 check to Northwestern National Bank in Minneapolis, opened a new account with it, wrote a check to Melrin on that account in the amount of $74,634.00, and delivered it to Melrin along with the receipt for $76,000.00 from the Presentation Home. He there received from Melrin a note of the Minnesota Screw Company in the amount of $74,634.00.
 
 
 10
 Thus, based on the above and other transactions, the plaintiff alleged in his second amended complaint that it was his information and belief that the "defendant Verschoor engaged in a conspiracy with Melrin in breach of trust, or participated in breaches of trust with Melrin and participated with Melrin in a scheme and plan to conceal then current or prior breaches of trust or defalcations by Melrin, and other improper transactions, in consideration of which defendant acquired at a discount, a substantial stock interest in a Minnesota corporation known as Central Lumber Company, and certain notes and a mortgage on the assets of a Minnesota corporation known as Minnesota Screw Company, and other benefits and advantages of value."
 
 
 11
 Verschoor's thesis at trial and in brief was that he was an innocent purchaser for value, that he was not guilty of any wrongdoing, and that, rather than being enriched, he ultimately sustained a loss in his dealings with Melrin.
 
 
 12
 THE LEGAL ISSUES.
 
 
 13
 
 I. Right of the Trustee of a Charitable Trust to Maintain Suit Against a Third Party to Recover Damages for Wrongs Against the Trust.
 
 
 
 14
 This initial issue involves the question of whether the Attorney General of Minnesota has the preclusive right to maintain such an action. Here, the suit was brought by appellant in his capacity as Acting Trustee under the Goodridge will by appointment of the Minnesota District Court. The Attorney General was not originally made a party. However, on the sixth day of May, 1966, appellant was appointed by the Minnesota Attorney General as his Special Assistant to serve in all matters concerning this litigation and with authority to ratify all previous actions by appellant. After commencement of the trial, appellant tendered his commission in evidence and moved to amend the complaint by adding to the parties plaintiff "and Henry Halladay, as Assistant Attorney General of the State of Minnesota, and Henry Halladay, as Relator for and on behalf of Robert W. Mattson, Attorney General of Minnesota." The trial court rejected the tender of the commission in evidence and refused permission for an amendment to the complaint adding Halladay in his official state capacity.
 
 
 15
 Although at common law charitable trusts had been recognized and upheld, the Minnesota Legislature early abolished all trusts except those authorized by statute. Longcor v. City of Red Wing, 206 Minn. 627, 289 N.W. 570, 572 (1940). In 1927, the Minnesota Legislature adopted a statute expressly authorizing charitable trusts.[1] This statute with minor exceptions merely adopts the cy-pres doctrine and contains the following sentence: "The attorney general shall represent the beneficiaries in all cases arising under this section and it shall be his duty to enforce such trusts by proper proceedings in the courts." The statute does not authorize the attorney general to represent the trustee, and the trustee here is not a beneficiary and neither is the suit one for enforcement of the trust. As a matter of fact, the Minnesota statute, as we interpret it, does not vest the attorney general with any more authority or obligation than he had at common law as the representative of the public. In olden times in England, even before enactment of the Statute of Charitable Uses in 1601, suits were brought concerning charitable trusts by the attorney general as well as by third parties. Historically, the attorney general represents the public interests with or without specific statute. He is and always has been an officer with many duties and the attorney general's sporadic attention to trust matters was at least one of the reasons for adopting the Statute of Uses which provided for appointment of commissioners to inquire into abuses in charitable trust matters and to make orders in redress thereof. Restatement (Second), Trusts 2d § 368 (1959). In Longcor, supra, in transactions occurring during the period of Minnesota's ban on charitable trusts, the court held that its attorney general was nevertheless obligated to enforce the terms of a gift on condition. This Minnesota opinion also points out, as do others, as well as texts on the subject, that the significant reason for vesting the attorney general with authority and precluding beneficiaries from bringing suits involving charitable trusts is to obviate, in ordinary cases, frequent, unreasonable and vexatious litigation. Longcor, supra at 574, 575 of 289 N.W. There is an obvious distinction between the case at hand and one brought by a beneficiary of a trust in that here the successor-trustee has a special interest separate and apart from the beneficiary. The trustee's acceptance of the trust automatically carried with it the imposition on him of loyalty to the trust and the duty to preserve and protect the trust estate. With such high responsibility, it would be anomalous and completely impractical to rule that the trustee lacks authority to act not only to preserve and protect the trust estate but additionally for his self-protection regarding his obligation to the trust. In bringing suit against a third party for an alleged wrong to the trust, the trustee was only doing what he was morally and legally bound to do. Failure to take action under the circumstances here could have exposed him to personal liability for negligence. This is not to say that the attorney general is not a proper party but only that he was not an indispensable party within the context of this case. In 4 Scott, Trusts § 393 (2d ed. 1956), it is stated:
 
 
 16
 "In the case of charitable trusts, as in the case of private trusts, the trustees can maintain such actions at law or suits in equity against a third person acting adversely to the trust as they could maintain if they held the property free of trust. Thus the trustees can maintain an action at law against a third person who commits a tort with reference to the trust property, either to recover the property or to recover damages for the tort."
 
 
 17
 The following from Restatement (Second), Trusts 2d § 393 (1959), is to the same effect:
 
 
 18
 
 "Actions against Third Persons
 
 
 
 19
 
 "An action against a third person acting adversely to the trustees of a charitable trust can be maintained by the trustees.
 
 
 
 20
 
 "Comment:
 
 
 
 21
 "a. Scope of the rule. In an action against a third person acting adversely to the trustees the Attorney General is ordinarily not a necessary party. Thus, if a third person converts property which is held upon a charitable trust, the trustees can maintain an action at law against him to recover the property or damages for the conversion."
 
 
 22
 In Restatement (Second), Trusts 2d § 294 (1959), paragraphs "c" and "e", the principle is stated that a trustee can maintain a suit against a transferee of trust property who is not a bona fide purchaser, and further that if the trustee in a breach of trust transfers trust property to a person not a bona fide purchaser, the successor-trustee can maintain a suit against the third person.
 
 
 23
 The fact the attorney general, although attorney for beneficiaries of a charitable estate, is not the attorney for the trustee and that a trustee is possessed of the right to bring an action against third parties, is clearly stated and supported by practical reason as well as weighty authority by the Missouri court in Murphey v. Dalton, 314 S.W.2d 726, 730, 731, 67 A.L.R.2d 1278 (1958).[2]
 
 
 24
 In our view, the cases cited in support of the trial court's ruling are inapposite from a factual standpoint, as no case has been cited to us involving a successor-trustee's suit against a third party concerning the third party's alleged wrong against the trust estate. Many writers on the subject have used, too broadly we think, the expression that the attorney general has preclusive rights to bring suits involving charitable trusts.[3] An often-cited case is Dickey v. Volker, 321 Mo. 235, 11 S.W.2d 278, 62 A.L.R. 858 (1928). Dickey is a most comprehensive opinion by the Missouri Supreme Court sitting en banc in which it is stated that "[c]ounsel have briefed the whole of the law relating to charitable trusts." The Dickey suit was for mismanagement or misuse of property in the sale of assets of a charitable trust, and it was held that the trust was for the entire public and the action must be taken by the attorney general as representative of the public. The plaintiffs made the attorney general a party defendant after he declined to "pitch" the suit. When made a party defendant, the attorney general demurred to the petition on the ground that plaintiffs were without legal capacity to institute the suit. Nowhere in this erudite opinion does the Missouri court conclude or even intimate that the attorney general has the preclusive right to bring such a suit as against one having a special interest other than as a member of the public.
 
 
 25
 The A.L.R. annotation on standing to sue following the Dickey opinion, 62 A.L.R. 881, 885, notes that some cases, at least in the language of the opinion, appear to support the proposition that the attorney general is the only person entitled to maintain a suit to enforce or administer a charitable trust, but the statement goes on to point out that this is not the general rule as there are numerous cases set out in the annotation in which the action has been held maintainable by other parties.[4]
 
 
 26
 Murphey v. Dalton, supra, decided by the Missouri court thirty years after Dickey, obviously more pointedly discusses the specific issue here and expresses agreement with the rule permitting a trustee to bring suit without necessity of joining with the attorney general when the trustee's special interests are involved.
 
 
 27
 Certainly, the attorney general has the preclusive right as against beneficiaries who are one of a class in many cases, but on the other hand cases can arise where the attorney general would have a conflict of interest if he were solely authorized to represent the trust in all matters. This would most assuredly be the case where a matter of taxation of the trust might be involved because the attorney general would be the attorney for the state seeking the tax, and at the same time attorney for the charitable estate seeking to avoid the tax.
 
 
 28
 We also are of the opinion that the court erred in refusing to permit amendment to the complaint to include appellant as a party litigant in his capacity as special representative of the attorney general. The attempt to thus amend was during the course of the trial and some two years after the suit was instituted, but, even so, no possibility of prejudice could have resulted. No additional evidence was contemplated or required and no delay by permitting such a joinder would have ensued. Since no evil or prejudice would have resulted, we think it was in the interest of justice to permit the amendment.
 
 
 29
 Fed.R.Civ.P. 21 provides, inter alia, "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."
 
 
 30
 In Truncale v. Universal Pictures Co., 82 F.Supp. 576, 578 (E.D.N.Y.1949), the court stated:
 
 
 31
 "In so far as this rule relates to the addition of parties, it is intended to permit the bringing in of a person who, through inadvertence, mistake or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable * * *."
 
 
 32
 The above language was quoted with approval in United States v. Commercial Bank of North America, 31 F.R.D. 133, 135 (S.D.N.Y.1962).
 
 
 33
 Rule 21 was adopted to obviate the harsh common law adherence to technical rules of joinder. Kerr v. Compagnie De Ultramar, 250 F.2d 860, 864 (2nd Cir. 1958).
 
 
 34
 Professor Moore states in 3 Moore, Federal Practice ¶ 21.04, at 2905-2906 (2d ed. 1966):
 
 
 35
 "If, of course, a truly indispensable party has not been joined, that defect can be raised at any stage, because the theory underlying the concept of indispensable party is that the court cannot enter a just and equitable judgment without the presence of such absent party."
 
 
 36
 We do not believe that the attorney general here was an indispensable party but, if he were, the court should have on its own initiative made him a party when the question first arose. Joinder of parties was granted after twenty-six months where no prejudice resulted from delay and was in the interest of justice in McSparran v. Gable, 223 F.Supp. 127 (D.C.Pa.1963). Compare Fogel v. United Gas Improvement Co., 32 F.R.D. 202 (D.C.Pa.1963), where cross-claims were permitted three years after service of process in the original actions.
 
 
 37
 The reasoning underlying the federal rule leads us to conclude that the trial court abused its discretion in denying the proposed amendment to add appellant in his official capacity as a special assistant attorney general as a party plaintiff.
 
 
 38
 
 II. Nature of Claims.
 
 
 
 39
 It is contended that the court improperly transferred this case to the law docket, requiring a trial to a jury. The original and first amended complaints sought an accounting and damages and failed to allege any specific averments of fiduciary relationship between the parties. The case proceeded to trial on a second amended complaint which in essence was a suit for damages based on allegedly fraudulent conduct by Verschoor with Melrin resulting in damages and loss to the trust estate. The basic nature of these claims, in our opinion, presents issues solely of a legal nature. It is settled law that the right to trial by jury in federal courts is to be determined as a matter of federal law in diversity as well as in other actions. Simler v. Conner, 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963).
 
 
 40
 Ordinarily, enforcement of administration of trusts and proceedings involving trusts are subjects for equity jurisdiction, but where the basic nature of the claims present only legal issues, it is entirely proper, particularly in light of modern rules and tendency, to treat the case as one belonging on the law docket.
 
 
 41
 In DePinto v. Provident Security Life Ins. Co., 323 F.2d 826 (9th Cir. 1963), cert. denied, 376 U.S. 950, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964), the court, noting the teachings of the Supreme Court in Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 501, 79 S.Ct. 948, 951, 3 L.Ed. 2d 988 (1959), stated:
 
 
 42
 "Having in mind the necessity of scrutinizing, with utmost care, any seeming curtailment of the right to a jury trial, we hold that where a claim of breach of fiduciary duty is predicated upon underlying conduct, such as negligence, which is actionable in a direct suit at common law, the issue of whether there has been such a breach is, subject to appropriate instructions, a jury question. We therefore conclude that, in the context of this case, the question concerning breach of fiduciary duty, as well as negligence, should have been submitted to the jury." 323 F.2d at 837.
 
 
 43
 The court in Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp., 294 F.2d 486, 491 (5th Cir. 1961), stated that "[a]s long as any legal [issue] is involved the jury rights it creates control. This is the teaching of Beacon Theatres, as we construe it."[5]
 
 
 44
 In our view, the legal remedies here were completely adequate, and it was proper to treat this case as an action at law and permit a jury to determine the disputed fact questions.
 
 
 45
 
 III. Statute of Limitations and Laches.
 
 
 
 46
 Verschoor sets up as an affirmative defense the statute of limitations and/or laches. It will be observed at the outset that, in most instances, statutes of limitation apply to actions at law while laches is the analogous rule applied to equitable proceedings. We have hereinabove expressed the view that this case was properly treated as an action at law, but in any event it was timely brought.
 
 
 47
 We have concluded that the law of South Dakota, or, in other words, the law of the forum, governs in this case. The general rule is expressed in 53 C.J.S. Limitations of Actions §§ 27 and 29 (1948) as follows:
 
 
 48
 "§ 27. In General
 
 
 49
 "* * * [T]he general rule is that in respect of the limitation of actions the law of the forum governs, regardless of where the cause of action arose, or of whether or not the action would be barred in the state in which it arose, and irrespective of the residence of the parties at the time the cause of action accrued. * * *"
 
 
 50
 "§ 29. Actions of Tort
 
 
 51
 "The rule in favor of the lex fori, in determining what law governs as to the limitation of actions, as discussed supra § 27, applies to actions for torts, as for instance, * * * actions for damages for fraud and deceit * *."
 
 
 52
 The rules in both the courts in South Dakota where the case was tried and in Minnesota where the trust estate was created follow the general rule stated in the text cited. Wolfe v. Order of U.C.T. of America, 70 S.D. 452, 18 N.W.2d 755 (1945); Weston v. Jones, 160 Minn. 32, 199 N.W. 431 (1924).
 
 
 53
 The South Dakota statute, SDC § 33.0232(4) (f), which pertains to actions based on the ground of fraud, provides as follows:
 
 
 54
 "Except where, in special cases, a different limitation is prescribed by statute, civil actions other than for the recovery of real property can be commenced only within the following specified periods of time after the cause of action shall have accrued: * * * (4) Within six years: * * * (f) An action for relief on the ground of fraud, in cases which heretofore were solely cognizable by the court of chancery."
 
 
 55
 This statute was originally interpreted as applying to cases in equity only.[6] However, in the case of Hinkle v. Hargens, 76 S.D. 520, 81 N.W.2d 888, 890-891 (1957), where damages were sought in a malpractice case, the South Dakota Supreme Court held that although the plaintiff's action, being one at law for damages, was outside the scope of the South Dakota statutory "fraud" exception to the statute, nevertheless, in accord with the construction placed upon an identical Iowa statute by the Iowa Supreme Court and in accord with the weight of authority, fraudulent concealment of a cause of action should be recognized as an implied exception to the South Dakota statute of limitations, and that it should apply to both legal and equitable actions.
 
 
 56
 Another South Dakota statute, SDC § 33.0235, provides as follows:
 
 
 57
 "An action for relief on the ground of fraud in cases which heretofore were solely cognizable by a court of chancery, the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."
 
 
 58
 Under the holding in the Hinkle case, supra, the above statute, of course, also applies not only to suits in equity but, by implication, to actions at law.[7] An examination of the case law in other jurisdictions discloses that the South Dakota statute is merely an enactment of the view expressed by a majority of the courts on this question. See 173 A.L.R. 576 and 54 C.J.S. Limitations of Actions § 206b.
 
 
 59
 It is undisputed that most, if not all, of the transactions complained of took place less than six years prior to the institution of this suit, i. e., they began in 1958 and the original complaint was filed May 4, 1964. However, Verschoor contends that the action is barred under a Minnesota five-year statute of limitations pertaining to the recovery of, or the setting aside of the sale of property sold, leased, etc. by the representative of a decedent's estate.[8] He also mentions an analogous South Dakota three-year statute of limitations but does not comment as to its applicability.[9] Appellant is not seeking to have the sale of the various shares of stock here involved set aside, as contemplated by the statutes relied upon, but is bringing an action alleging the fraudulent acts of Verschoor, as a ground entitling the estate to restitution of the value of the assets of which it was defrauded by Verschoor, working in cooperation with Melrin, who has since been proven guilty of perpetrating a fraud upon the estate. Consequently, the statutes relied upon do not apply.
 
 
 60
 Furthermore, as hereinbefore noted, the six-year statute of limitations would not begin to run until the fraud was discovered. The criminal investigation concerning the fraudulent activities of Melrin was not begun until February 1960, and it was not until February 2, 1962 that a hearing on a petition asking for an accounting by Melrin was commenced in the District Court of Hennepin County, Minnesota, at which time much of the evidence was introduced which appellant charges in this suit implicates Verschoor as a knowing participant in the fraudulent acts of Melrin. Also, the audit report showing the losses which the estate had sustained as a result of these transactions was not completed until 1962, and this suit was filed May 4, 1964, approximately two years thereafter. It is, therefore, evident that the action was brought well within the applicable six-year statute of limitations.
 
 
 61
 Neither would the action be barred under the equitable doctrine of laches. It will be noted that the applicable South Dakota statutes pertain to equitable as well as legal proceedings. Since the action would not be barred by the statute, it would not, under our general rule, be barred by laches. Verschoor points out, however, that there are instances in which "laches may bar equitable relief even before the local Statute of Limitations has run," citing Barnhart v. Western Maryland Ry., 128 F.2d 709 (4th Cir. 1942). While this, of course, can be true under certain sets of facts, it is certainly not true in the present litigation.
 
 
 62
 We think it is sufficiently clear from the foregoing that the undisputed facts show that, as a matter of law, there is no merit to Verschoor's claim that the action is barred by either the statute of limitations or laches, but that the suit was brought well within the time permitted by law.
 
 
 63
 
 IV. Evidentiary Questions.
 
 
 
 64
 Evidence concerning the recovery of $200,000.00 by the estate from the sureties on Melrin's bond was permitted by the court to be introduced, over objections that the evidence was irrelevant and immaterial to any issue in the case; that it had nothing to do with the liability of the defendant; that it was an attempt to plead payment or recovery from a source for which the defendant would not be entitled to credit and, therefore, in mitigation of damages; and that it was highly prejudicial to plaintiff. The court also refused to give plaintiff's Requested Instructions Nos. 19 and 20, instructing the jury either to disregard the evidence concerning the receipt by the trust estate of the $200,000.00 under Melrin's bond or instructing the jury that said payment does not in any way affect the rights or responsibilities of the defendant Verschoor.[10]
 
 
 65
 There is record evidence that Melrin's cash shortage was in excess of $345,000.00 in addition to the stock shortage. The surety companies agreed to pay the $200,000.00 in settlement under Melrin's bond, and expressly waived their rights of subrogation or indemnity against any third party except Melrin. This suit was not an effort to recoup for the indemnity companies the $200,000.00 which they had paid to the estate. The estate had been paying premiums on the surety bond to protect the assets thereof from loss occasioned by any defalcations by Melrin, and was entitled to collect under the bond and also to sue for damages to the estate caused by the fraudulent acts of third parties.[11] In Bank of Italy Nat'l Trust & Sav. Ass'n v. Farmers' & Merchants' Nat'l Bank, 44 F.2d 325, 327 (9th Cir. 1930), it was said:
 
 
 66
 "Neither item was paid by the surety for the purpose of discharging the obligation in suit; they were not intended for any such purpose, nor were they accepted by the appellant with that object in view. On the contrary, it was expressly agreed between the parties that an action should be brought by the appellant to recover for the conversion, and this agreement is utterly inconsistent with a claim that the money was paid for the purpose of discharging the obligation to be sued upon. For these reasons, the court erred in allowing the deductions complained of."
 
 
 67
 Under the general rule, the fact that the plaintiff is protected by insurance or other indemnity cannot be shown. Indamer Corp. v. Crandon, 217 F.2d 391, 394 (5th Cir. 1954); Altenbaumer v. Lion Oil Co., 186 F.2d 35, 36 (5th Cir. 1950), cert. denied 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350; General Mills v. Goldman, 184 F.2d 359, 374 (8th Cir. 1950); Kester v. Travelers Indem. Co. of Hartford, Conn., 257 Iowa 1146, 136 N.W.2d 261, 264 (1965); Jeddeloh v. Hockenhull, 219 Minn. 541, 18 N.W.2d 582, 588 (1945); McCornack v. Pickerell, 225 Iowa 1076, 283 N.W. 899, 903 (1939); Rutherford v. Gilchrist, 218 Iowa 1169, 255 N.W. 516, 518-519 (1934); Evans v. Chicago M. & St. P. Ry., 133 Minn. 293, 158 N.W. 335, 336 (1916); 88 C.J.S. Trial § 53b. (1955); 77 A.L.R.2d 1154. The reasoning behind this rule is that the parties are entitled to have the issues determined on their merits and that the injection of the insurance or indemnity feature leading to the conclusion that the damages sued for have been or will be taken care of by an insurance or indemnity company is utterly repugnant to a fair trial or to the securing of the rendition of a just verdict. Therefore, unless the fact that the plaintiff is insured or otherwise indemnified is a material issue in the case, or unless the prejudicial effect has been cured by an admonition or instruction to the jury to disregard it, it has been almost universally held that the receipt of such evidence constitutes prejudicial error sufficient to require reversal.
 
 
 68
 Under the facts presented here, we hold that the evidence concerning recovery by the estate from the sureties on Melrin's bond was irrelevant and immaterial; that it was of no legal concern to Verschoor, the defendant, or to the jury; that the payment by the surety companies had no effect to either preclude recovery or to minimize the amount of the damages; that the introduction of such evidence was highly prejudicial to the plaintiff; that no attempt was made by the trial court to cure this error; and that these admission of said evidence under all of these circumstances constituted reversible error.
 
 
 69
 We think the court also committed error in excluding evidence of Verschoor's 1958 and 1960 tax returns which had been furnished the plaintiff voluntarily. These returns were offered as being contradictory of Verschoor's testimony as to the price he paid for the two hundred shares of Central Lumber Company stock in the St. Joseph Hospital transaction. It appears to us that the evidence was relevant for the purpose of affording the jury an opportunity to consider these records in determining the true price paid for said stock. We also think the evidence was competent for impeachment purposes in that the jury had a right to consider it as showing inconsistent statements of the witness. 3 Wigmore, Evidence § 1017 (3d ed. 1940).
 
 
 70
 We have no knowledge of what evidence will be forthcoming in a retrial, but as a matter of guidance we suggest that the governing measure of damages be kept in mind, particularly with respect to the admissibility of evidence in connection with Verschoor's ultimate loss by his investment in the Minnesota Screw Company. From the context of the record here, we do not understand that such loss bears on any legitimate issue in this case and could well have had an influencing and prejudicial effect on the jury. We do not assume that Verschoor was guilty of any wrongdoing, but if the evidence is such as to convince the jury of his liability under the allegations in the complaint, then he would be obliged to make the trust estate whole for any loss accrued to it by his collusion with Melrin as well as any additional profits he might have made from the transaction. Contrarily, he would not be entitled to offset any investment loss growing out of any transaction with Melrin in conjunction with a venture with which the trust was not concerned. The measure of damages rule is stated in Restatement, Restitution § 149 (1937) as follows:
 
 
 71
 "If the defendant was tortious in his acquisition of the benefit he is required to pay for what the other has lost although that is more than the recipient benefited. If he was consciously tortious in acquiring the benefit, he is also deprived of any profit derived from his subsequent dealing with it."
 
 
 72
 See also Lawrence Warehouse Co. v. Twohig, 224 F.2d 493, 498 (8th Cir. 1955).
 
 
 73
 
 V. Instructions.
 
 
 
 74
 In addition to appellant's complaint concerning the court's refusal to give his Requested Instructions Nos. 19 and 20, discussed under IV, supra, appellant also complains that in seven successive instructions, the court told the jury, in effect, that a bona fide purchaser for value without notice holds title free of trust and is under no obligation to the trust. A trial court should not needlessly repeat statements respecting theories or defenses if the effect is argumentative or tends to mislead or influence a jury. In fact, a court should go as far as possible to avoid giving undue emphasis or prominence to a particular issue or theory. White Auto Stores v. Reyes, 223 F.2d 298, 305 (10th Cir. 1955).[12]
 
 
 75
 Complaint is also made with respect to the court's failure to give plaintiff's Requested Instructions Nos. 14 and 17.[13] Both of the instructions amount to directions of verdict on matters that we cannot say are uncontested, unconceded or established by uncontradicted evidence, and in such context only the jury should make a conclusion from all the evidence. A verdict should never be directed by the court when reasonable minds might arrive at different conclusions on the evidence. This is not to say that both parties are not entitled to instructions on their theory of the case if there is proper evidence in support thereof. Town of Radcliffe, Iowa v. Carroll, 360 F.2d 321 (8th Cir. 1966). But, in the context of the case here, we do not think the present record evidence supported a directed verdict on the entire case or any aspect of it.
 
 CONCLUSION
 
 76
 It is not clear from the instant record the precise grounds upon which the trial court based its judgment n. o. v. but the indication from an entry by the clerk suggests that the court was motivated by a concern as to plaintiff's being a proper party and in doubt as to quantum of proof as establishing fraud. We have indicated our disagreement as to the proper party issue, and the resumé of the evidence tending to establish the charges in the complaint suffices to reveal the patency of sufficient evidence to make a jury question on determination of the fraud issue.
 
 
 77
 For the errors indicated, we reverse and remand for a new trial consistent with this opinion and with instructions to permit joinder of Halladay as a party plaintiff in his official capacity as a Special Assistant Attorney General for the State of Minnesota.
 
 
 
 Notes:
 
 
 [1]
 28 M.S.A. § 501.12, Subd. 3 reads as follows:
 "Subdivision 3. Liberal interpretation; administration. Such trust shall be liberally construed by the courts so that the intentions of the donor thereof shall be carried out when possible and no such trust shall fail solely because the donor has imperfectly outlined the purpose and object of such charity or the method of administration. When it shall appear to the district court of the proper county that the purpose and object of such charity is imperfectly expressed, or the method of administration is incomplete or imperfect, or that the circumstances have so changed since the execution of the instrument creating the trust as to render impracticable, inexpedient, or impossible a literal compliance with the terms of such instrument, such court may, upon the application and with the consent of the trustee, and upon such notice as the court may direct, make an order directing that such trust shall be administered or expended in such manner as in the judgment of the court will, as nearly as can be, accomplish the general purposes of the instrument and the object and intention of the donor without regard to, and free from any, specific restriction, limitation, or direction contained therein. No such order shall be made without the consent of the donor of the trust if he is then living and mentally competent. The attorney general shall represent the beneficiaries in all cases arising under this section and it shall be his duty to enforce such trusts by proper proceedings in the courts."
 
 
 [2]
 The Missouri court stated in Murphey v. Dalton, supra:
 "Now it may be that the attorney general was a necessary party (and certainly, he was a proper party) in the Hesse will contest suit filed by testatrix' heirs. That fact, however, or the further fact that the attorney general is a proper party, and perhaps the only proper party, to bring an action against the trustees of a public charitable trust for mismanagement and is the proper party to bring an action to enforce a public charitable trust (citing cases) does not mean that the trustees of a public charitable trust are thereby rendered impotent to perform their duties and discharge their responsibilities as trustees.
 "On the contrary, it is well established that the duties and liabilities of the trustees of public charitable trusts are like the duties and liabilities of the trustees of private trusts, and that the same principles applicable to private trusts govern in public charitable trusts. (Citations omitted.) And trustees of a public charitable trust, like trustees of a private trust, may bring actions against third persons to recover or preserve or protect the trust assets and may bring suits for instructions, and it should follow that they may take any reasonable action (including the defense of a will contest suit) necessary to uphold the validity of the trust established by a will and thereby protect and preserve the trust assets. (Citations omitted.) And it must follow that if the trustees of a public charitable trust are liable for breaches of trust to the same extent as are other trustees, they must of necessity have the right, as do trustees of private trusts, to retain counsel of their own choosing to render necessary legal services. (Citations omitted.)
 "The plain fact is, the attorney general is not and, in many instances, could not properly be the attorney for the trustee of a public charitable trust. He is the attorney for the public, not the attorney for the trustee. The trustee and the attorney general may hold opposite views as to many matters arising in the administration of a public charitable trust. It is obvious that the attorney general, representing the public, whose views, for example, as to the powers of the trustee to perform certain acts, are opposite to those of the duly appointed trustee who is liable for wrong action, should not represent the public and, at the same time, the adverse party, the trustee."
 
 
 [3]
 The following statement appears in 15 Am.Jur. 2d, Charities § 120 (1964):
 "Although some decisions state that the attorney general is the only person entitled to maintain a suit to administer or enforce a charitable trust, such a statement is too broad if taken as including special interests of particular persons other than as members of the public. * * *"
 
 
 [4]
 The following statement of the text writer appears in the annotation on page 901:
 "The cases support the right of the trustees of a benevolent or charitable trust to maintain a suit to recover the trust funds, or to obtain directions as to the mode of administration, or otherwise protect the trust property or compel compliance with the intention of the founders or donors thereof."
 
 
 [5]
 Professor Moore in 5 Moore, Federal Practice ¶ 38.20, at 175 (2d ed. 1966) states:
 "In the abstract, fraud is neither a legal nor an equitable issue. For the purpose of determining whether an issue of fraud should be tried to the court or to the jury the relief sought by the party raising the issue becomes important. Thus where the plaintiff seeks damages for the conversion of chattels as a result of defendant's fraud the claim is legal. Similarly a claim for damages predicated upon the fraud and deceit of the defendant is essentially an old common law action of trespass on the case."
 
 
 [6]
 Schindler v. Spackman, 16 F.2d 45 (8th Cir. 1926). See also Lundquist v. First Nat'l Bank of Beresford, 65 S.D. 95, 271 N.W. 664 (1937)
 
 
 [7]
 Minnesota also has a six-year statute of limitations for bringing actions based on fraud. M.S.A. § 541.05 provides in germane portion:
 "The following actions shall be commenced within six years: * * * (6) For relief on the ground of fraud, in which case the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud * * *."
 
 
 [8]
 "No proceeding to have declared invalid the sale, mortgage, lease, or conveyance by a representative shall be maintained by any person claiming under or through the decedent * * * unless such proceeding is begun within five years immediately succeeding the date of such sale, mortgage, lease, or conveyance * * *." M.S.A. § 525.702
 
 
 [9]
 "No action for the recovery of any property of an estate sold by the executor * * * under the provisions of this chapter, can be maintained by any heir or other person claiming under the decedent * * * unless it be commenced within three years next after the sale." SDC § 35.1505
 
 
 [10]
 
 "PLAINTIFF'S REQUESTED INSTRUCTION No. 19
 "You are instructed that the evidence in this case shows that the plaintiff by settlement recovered $200,000.00 from sureties on the fiduciary bonds of L. E. Melrin, and that the cash loss to the trust under the will of Gertrude Goodridge, deceased, was in excess of $340,000.00, and that the sureties in making such settlement relinquished all claims, or rights to subrogation, against others on account of the shortages involved, except against L. E. Merlin. The payment and receipt of said sum of $200,000.00 by the plaintiff does not affect any rights or responsibilities of the defendant Verschoor in this case.
 "PLAINTIFF'S REQUESTED INSTRUCTION No. 20
 "You are instructed to disregard the evidence in this case in regard to the receipt by the plaintiff of $200,000.00 from the sureties of the trustee on the fiduciary bonds of L. E. Melrin."
 
 
 [11]
 "The general rule is well settled, at least in the case of an action founded in tort, that the recovery of damages by the owner of property injured or destroyed by the fault of another is, as to the person in fault, absolutely unaffected by the fact that he may have already received full payment for his loss by insurance — the payment by the insurer having effect neither to preclude a recovery nor to minimize the amount of the damages." 81 A.L.R. 320. See also 22 A.L.R. 1558 and 18 A.L.R. 683
 
 
 [12]
 The court stated in White Auto Stores v. Reyes, supra at 305:
 "A trial court in its instructions to the jury should, so far as possible, avoid undue emphasis of issues, theories or defenses by repetition or by giving them undue prominence or by minimizing the importance of others."
 
 
 [13]
 
 "PLAINTIFF'S REQUESTED INSTRUCTION No. 14
 "One part of the plaintiff's claim here is for the sum of $11,250, paid by Melrin to defendant's son-in-law, James P. Carney. Although that sum was treated by Melrin as a broker's commission, the evidence is undisputed that Carney did nothing to earn any part of that sum, and its payment by Melrin was a breach of his trust. The evidence is also undisputed that defendant, knowing that Carney did nothing to earn that money, participated with Melrin in nevertheless having the money paid to Carney. Therefore, you are directed to return a verdict for the plaintiff on that part of his claim, in the amount of $11,250.
 * * * * *
 "PLAINTIFF'S REQUESTED INSTRUCTION No. 17
 "Liability and Damages on Overall Defalcations
 "If you find that the defendant was a knowing participant in an overall effort by Melrin to use the charitable organizations about which we have had evidence in this trial, to conceal or cover-up Melrin's applications of trust funds to his own personal appearances, then you should award the plaintiff the entire damages sustained by the trust, which were $345,631.67."